Robert C. GUCCIONE,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 662, Docket 87–6207.

United States Court of Appeals,
Second Circuit.

Argued Jan. 15, 1988.

Decided May 26, 1988.

Alan M. Dershowitz, Cambridge, Mass. (Nathan Z. Dershowitz, Victoria B. Eiger, Mark D. Cahn, Dershowitz & Eiger, New York City, on the brief), for plaintiff-appellant.

David R. Lewis, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty., Nancy Kilson, Asst. U.S. Atty., New York City, on the brief), for defendant-appellee.

Before OAKES, NEWMAN and MINER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

Robert C. Guccione appeals from a judgment of the District Court for the Southern District of New York (Constance Baker Motley, Judge) dismissing his claim for damages against the United States allegedly resulting from the negligence of the

Federal Bureau of Investigation (FBI) in conducting its highly publicized Abscam operation in the late 1970's. Guccione's complaint charges that the FBI negligently failed to prevent a paid operative, Melvin Weinberg, from defaming Guccione to potential lenders and otherwise tortiously interfering with his attempt to secure financing for completion of a casino and hotel project in Atlantic City, New Jersey. The complaint seeks $400 million in damages. The District Court, in an opinion reported at 670 F.Supp. 527, entered judgment for the United States on the ground that the action is barred by sovereign immunity under the "intentional tort exception" to the Federal Tort Claims Act ("FTCA"), 28 U.S. C. § 2680(h) (1982), and alternatively that the action is time-barred under the applicable two-year statute of limitations. We affirm on the immunity ground.

## Background

Plaintiff-appellant Guccione, a businessman and publisher of Penthouse Magazine, initiated plans in the late 1970's to build a Penthouse Casino and Hotel in Atlantic City, New Jersey. The project's success depended in part upon securing financing and a casino license. Guccione alleges that an entity operating as Abdul Enterprises, Ltd. ("Abdul") was among the numerous potential lenders with which he was in contact during this time to secure financing for his project. Melvin Weinberg acted as the agent and representative of Abdul for these purposes. Abdul was not in fact a prospective lender, but an FBI undercover organization created by the FBI to carry out the Abscam sting operations.[1] Through Abdul, FBI operatives sought to uncover criminal activities by holding themselves out as the representatives of two wealthy Arab sheiks in search of American "investment opportunities" in the nascent casino and gambling industry in Atlantic City. Weinberg worked undercover in the Abscam investigation as an FBI operative and informant. His background and gener-

al role in Abscam have been described as follows:

> Abscam began after Melvin Weinberg in 1977 was convicted in the Western District of Pennsylvania on his plea of guilty to fraud. In return for a sentence of probation Weinberg agreed to cooperate with the FBI in setting up an undercover operation similar to the London Investors, Ltd. "business" that Weinberg had used with remarkable success before his arrest and conviction in Pittsburgh.
>
> For most of his life Weinberg had been a "con man" operating in the gray area between legitimate enterprise and crude criminality. For a number of years in the 1960s and early 1970s, he had been listed as an informant by the FBI and had provided his contact agent from time to time with intelligence about various known and suspected criminals and criminal activities in the New York metropolitan area and elsewhere, for which he had received in return occasional small payments of money. When he was arrested on the charge that led to his guilty plea, his informant status was cancelled, later to be reinstated after his guilty plea and agreement to cooperate with the FBI.

*United States v. Myers,* 692 F.2d 823, 829 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983) (quoting *United States v. Myers,* 527 F.Supp. 1206, 1209 (E.D.N.Y.1981)).

It is undisputed that Weinberg, acting as Abdul's representative, met or spoke with Guccione on at least three occasions during the course of the Abscam investigation to discuss the possibility of providing financing for Guccione's casino and hotel project. In these conversations Weinberg unsuccessfully sought to induce Guccione's participation in a scheme to secure a casino license through bribery or other illegal means. The tortious conduct alleged in the complaint arises out of Weinberg's initial attempt to create conditions that would compel Guccione's participation in the scheme, and his subsequent campaign to "punish" Guccione for refusing to cooper-

---

1. The background of the Abscam investigation is detailed in *United States v. Myers,* 692 F.2d 823, 829–34 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). *See also United States v. Silvestri,* 719 F.2d 577, 579–80 (2d Cir.1983).

ate. Weinberg allegedly told Guccione's business associates false stories about Guccione's ailing financial condition, his organized crime connections, and his unlikely prospects for receiving a casino license. When Weinberg recognized that Guccione would not join the illegal scheme, he told a Guccione business associate: "The best way to punish him [Guccione], he doesn't get the [casino project] built—that punishes more than anything else." Weinberg allegedly carried out this vindictive campaign by further maligning Guccione in statements to prospective lenders, influential politicians, and other business associates. The complaint claims that as a direct result of Weinberg's defamation and interference with Guccione's business interests, Guccione was unable to secure the necessary financing for the project between 1979 and 1983, when an exculpatory Senate Report[2] was published and disseminated to lenders.

The District Court dismissed Guccione's complaint for lack of subject matter jurisdiction because of sovereign immunity. The Court held that Guccione's claims against the United States, though pleaded in negligence, were claims "arising out of" the alleged intentional torts of the FBI operative, Weinberg, and were therefore barred by the "intentional tort" exception to the general waiver of sovereign immunity contained in the FTCA, 28 U.S.C. §§ 1346(b) (general waiver), 2680(h) (intentional tort exception) (1982). Alternatively, the District Judge granted the Government's motion for summary judgment on the ground that Guccione had failed to bring his action within the applicable two-year limitations period. Judge Motley found that plaintiff's claim was not first presented until November 28, 1984, or at the earliest July 18, 1984, but had accrued no later than March 1982. Judge Motley rejected Guccione's contention that he did not have notice of the defamatory conduct underlying his claim until the release of the Senate Report, *supra* n. 2.

## Discussion

■ Under the FTCA, the Government has waived immunity from suit for claims of property damage or personal injury caused by the "negligent or wrongful act or omission" of its employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Section 2680(h) of the FTCA, the so-called intentional tort exception, excludes from this limited waiver of sovereign immunity "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."[3] The task of maintaining the FTCA's jurisdictional boundary has been more difficult in practice than is suggested by the statute's facially neat distinction between claims sounding in negligence and those "arising out of" the enumerated intentional torts. Difficulty has arisen primarily in situations in which intentionally inflicted harm may have occurred in significant part because of the negligence of Government personnel. Appellant contends that this is such a case, and that his "negligent supervision" claim is actionable notwithstanding the apparent applicability of section 2680(h) to Weinberg's conduct.

Appellant's claim initially encounters a rather inhospitable line of cases broadly interpreting the scope of section 2680(h) in the context of "mixed" claims of negligence and intentional tort. *United States*

---

2. Final Report of the Select Committee to Study Undercover Activities of Components of the Department of Justice to the United States Senate ("the Senate Report"), S.Rep. No. 682, 97th Cong., 2d Sess. (1982). Part F of the Senate Report, entitled "Allegations Regarding the Investigation of Bob Guccione," provides much of the factual basis for the complaint.

3. In 1974, Congress amended FTCA coverage to include assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution by federal officials empowered to make searches, seizures, or arrests. Act of Mar. 16, 1974, Pub.L. No. 93–253, § 2, 88 Stat. 50 (amending 28 U.S.C. § 2680(h)). Appellant does not contend that this exception to the section 2680(h) exception applies in the present case.

*v. Shearer*, 473 U.S. 52, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985), was an action brought by the survivor of a serviceman who, while off duty and away from his base, had been kidnapped and murdered by another serviceman. The suit alleged that the Army knew of the assailant's dangerousness and negligently failed to warn others that he was at large. Chief Justice Burger, in a plurality opinion joined by three other Justices, found the claim barred by the express language of section 2680(h):

> Section 2680(h) does not merely bar claims *for* assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery. We read this provision to cover claims like respondent's that sound in negligence but stem from a battery committed by a Government employee.

*Id.* 473 U.S. at 55, 105 S.Ct. at 3042 (emphasis in original).[4]

This Court expressly adopted the *Shearer* plurality's view in *Johnson v. United States*, 788 F.2d 845 (2d Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 315, 93 L.Ed.2d 288 (1986). We affirmed the dismissal of a suit brought against the United States alleging negligent supervision of a postman who had sexually molested the child plaintiff. Indicating our "agree[ment] with the Chief Justice that the plain language of § 2680(h) prohibits claimants from clothing assault and battery actions in the garb of negligence by claiming negligent failure to prevent the attack," *id.* at 850, we concluded that the plaintiff could not avoid the FTCA's jurisdictional restrictions simply by alleging that the United States Postal Service had negligently hired, assigned, and supervised the assaultive postman "with notice or knowledge of [his] criminal and perverted propensities and tendencies," *id.* at 854.

We reaffirmed this interpretation of the "arising out of" phrase of section 2680(h) in *Miele v. United States*, 800 F.2d 50 (2d Cir.1986), a suit brought on behalf of a child who had been permanently blinded and disfigured when an AWOL soldier

threw acid in his face. The complaint alleged that the Army was on notice that the soldier had previously displayed an obsessive hostility toward the child and presented an imminent threat to him, and claimed that the Army was negligent in failing to appreciate the danger posed by the soldier's disturbed mental state, failing to adequately supervise the soldier, and failing to warn the plaintiff of the soldier's delusionary preoccupation with the child. Relying on *Shearer* and *Johnson,* we affirmed dismissal of the claim on the ground that the allegation of negligence merely presented the assault claim in artfully redrawn form. We note that most other circuits considering the question have adopted similarly broad views of the scope of section 2680(h) in the context of mixed claims of negligent and intentional conduct. *See Sheridan v. United States*, 823 F.2d 820 (4th Cir.1987), *cert. granted*, — U.S. —, 108 S.Ct. 747, 98 L.Ed.2d 760 (1988); *Thigpen v. United States*, 800 F.2d 393 (4th Cir.1986); *Hoot v. United States*, 790 F.2d 836 (10th Cir.1986); *Satterfield v. United States*, 788 F.2d 395, 399 (6th Cir.1986); *Garcia v. United States*, 776 F.2d 116, 118 (5th Cir.1985); *Wine v. United States*, 705 F.2d 366 (10th Cir.1983); *Naisbitt v. United States*, 611 F.2d 1350 (10th Cir.), *cert. denied*, 449 U.S. 885, 101 S.Ct. 240, 66 L.Ed.2d 111 (1980). *But see Morrill v. United States*, 821 F.2d 1426 (9th Cir.1987); *Kearney v. United States*, 815 F.2d 535 (9th Cir.1987); *Bennett v. United States*, 803 F.2d 1502 (9th Cir.1986).

Appellant advances two theories to distinguish the present case from *Shearer, Johnson,* and *Miele.* His primary contention is that under case law interpreting section 2680(h), particularly *Panella v. United States*, 216 F.2d 622 (2d Cir.1954), the statute's jurisdictional bar does not apply to claims that arise out of the intentional torts of non-governmental employees. He argues that the intentional tort exception is inapplicable in the present case because Weinberg qualifies as a non-governmental employee under the *Panella* rule,

---

**4.** A majority of the Court agreed that the claim was barred under the doctrine of *Feres v. United* *States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

or at least that the nature of Weinberg's relationship to the Government raises a substantial question of fact unsuited for disposition at this stage of the proceedings. Alternatively, appellant contends that Weinberg's intentional wrongdoing is separate and distinct from the gravamen of the complaint, which is that the FBI, by "failing to exercise requisite care in selecting, training, instructing, supervising and controlling Weinberg," Brief of Appellant at 27 n. 11, breached an "independent affirmative duty" owed to appellant himself: "There can be little question that by knowingly allowing Weinberg to engage in a crusade against Guccione, the government failed to exercise its duty to protect a foreseeable victim," *id.* at 25. Neither argument withstands scrutiny.

*The* Panella *Exception.* In *Panella, supra,* we held that a patient/inmate who had been assaulted by a fellow inmate at a federal prison hospital was not barred from bringing suit against the United States for failure adequately to supervise and protect those confined there. Appellant misreads *Panella* to establish a jurisdictional test turning upon the technical nuances of the intentional tortfeasor's employment relationship to the Government. Though a rigid employee/non-employee jurisdictional rule could be extracted from the often abbreviated references to *Panella* in subsequent case law,[5] shorthand references should not be permitted to obscure the decision's precise holding.

In *Panella,* the fact that the assailant was not a federal employee warranted emphasis only because it served as a useful way to demonstrate that, despite the claim's mixed allegations of both negligence and intentional conduct, the plaintiff's "negligence action is not merely an alternative form of remedy to an action for assault but negligence is rather the essence of the plaintiff's claim." *Panella v. United States, supra,* 216 F.2d at 624. The absence of *any* employment or work-related relationship between the assailant and the federal government provided a simple, unequivocal assurance that the negligent supervision claim really was the "essence" of the claim and not a surreptitious way of seeking to hold the United States liable for the intentional torts of those in some way carrying out the Government's business. *Panella* thus established a clear rule of easy application: where the intentional tortfeasor is *in no sense* carrying out the Government's business, the claim against the United States for negligent supervision of the assailant does not "arise out of" an intentional tort within the meaning of section 2680(h).[6]

■ Thus understood, *Panella* does not permit a negligent supervision claim to succeed whenever the intentional tortfeasor is not technically an "employee"[7] of the United States but nonetheless advancing the Government's interests in some more attenuated employment relationship or acting as an independent contractor.[8] A jurisdiction-

---

**5.** *See United States v. Shearer, supra,* 473 U.S. at 56, 105 S.Ct. at 3043 ("Today's result is not inconsistent with the line of cases holding that the Government may be held liable for negligently failing to prevent the intentional torts of a non-employee under its supervision."); *Thigpen v. United States, supra,* 800 F.2d at 394 n. 3; *Johnson v. United States, supra,* 788 F.2d at 851; *Jablonski v. United States,* 712 F.2d 391, 395 (9th Cir.1983); *Naisbitt v. United States, supra,* 611 F.2d at 1355; *Underwood v. United States,* 356 F.2d 92, 100 (5th Cir.1966); *Muniz v. United States,* 305 F.2d 285, 287 (2d Cir.1962), *aff'd,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Hughes v. Sullivan,* 514 F.Supp. 667, 669–70 (E.D.Va.1980), *aff'd,* 662 F.2d 219 (4th Cir.1981) (per curiam); *Pennington v. United States,* 406 F.Supp. 850, 851–52 (E.D.N.Y.1976).

**6.** Obviously, the negligence claim in *Panella* had to be rooted in *some* relationship between the

Government and either the assailant or the victim. *See infra* n. 9. The critical point here is that the relationship must be something other than the Government's purported duty to supervise or control those carrying out its business.

**7.** The FTCA defines "employee of the government" to include "officers or employees of any federal agency ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671 (1982). *See Witt v. United States,* 462 F.2d 1261, 1263–64 (2d Cir. 1972) (language to be broadly construed).

**8.** Appellant's reliance on *Slagle v. United States,* 612 F.2d 1157 (9th Cir.1980), as a model for analysis is unavailing. Though the Ninth Circuit undertook to determine the precise nature

al rule based upon such technicalities, as urged by appellant, is not suggested by either the language of section 2680(h) or its underlying purposes. As we observed in *Johnson* and *Miele*, the "arising out of" language is broad and must not be circumvented by techniques of artful pleading. Likewise, the legislative history, though meager, *see Johnson v. United States, supra*, 788 F.2d at 852–53 & n. 5, carries no suggestion that Congress contemplated the technical rule advanced by appellant. *See, e.g., Tort Claims: Hearings on H.R. 5373 and H.R. 6463 Before the House Committee on the Judiciary*, 77th Cong., 2d Sess. 33 (1942) (section 2680(h) directed at situations in which *"some agent of the government gets in a fight with some fellow ...* [a]nd socks him"*)* (emphasis added).

Appellant understandably reads *Panella* quite differently. He believes that the rationale of this decision is a sharp distinction between the intentional torts of Government *employees* and the intentional torts of all others. In his view, *Panella* made that distinction to guard against the risk that a claim alleging negligent supervision of an employee tortfeasor would succeed because the fact-finder is influenced by the doctrine of *respondeat superior*, even though the claim nominally alleges primary negligence on the part of the Government. His point is that intentional torts of *non-employees* should survive dismissal because such claims encounter no risk that an allegation of primary negligence on the part of the Government will be a pretext for imposing liability on the basis of *respondeat superior*, which is unavailable absent an employee or similar master-servant relationship, *see Prosser and Keeton on the Law of Torts* § 70 (5th ed. 1984).

This approach is flawed in two respects. First, it converts what is only a mechanical device for enabling the fact-finder to focus on the primary negligence of the Government into an absolute jurisdictional rule. If the critical jurisdictional question were

whether negligence on the part of some Government personnel could be isolated as the primary or essential basis of the claim, the inquiry could be more sensibly carried out without pausing to ascertain the intentional tortfeasor's employment status. *See Sheridan v. United States, supra*, 823 F.2d at 825 (Winter, J., dissenting); Note, *The Talismanic Language of Section 2680(h) of the Federal Tort Claims Act*, 69 Temple L.Q. 243 (1987); Note, *Section 2680(h) of the Federal Tort Claims Act: Government Liability for Negligent Failure to Prevent an Assault and Battery by a Federal Employee*, 69 Geo.L.J. 803 (1981). Indeed, one circuit has interpreted section 2680(h) to permit negligent supervision claims against the Government as long as the employee's intentional wrongdoing was a foreseeable consequence of the alleged negligence. *See Morrill v. United States, supra*, 821 F.2d at 1427 (citing Ninth Circuit cases).

■ Second, and more fundamentally, appellant's view of *Panella* fails to take into account subsequent case law in this Circuit that illuminates the boundaries of section 2680(h). In our effort to explain *Panella*, we are obliged to recognize that this decision does not stand in isolation but is part of a sequence that now includes *Johnson* and *Miele*. These latter cases demonstrate that the United States is not liable for the intentional torts of those carrying out its business, even though the plaintiff alleges a claim of primary negligence on the part of the United States in failing to supervise or otherwise avoid foreseeable risks. In *Miele*, for example, the plaintiffs alleged that the Army "negligently failed to: (1) appreciate [the assailant's] paranoid schizophrenic mental state; (2) adequately supervise [the assailant]; and (3) warn plaintiffs of [the assailant's] delusionary preoccupation toward them." *Miele v. United States, supra*, 800 F.2d at 51. These claims, held to be barred under section 2680(h), are functionally indistinguish-

---

of an informant's employment status in *Slagle*, the inquiry was made in the context of a claim against the Government for harm allegedly caused by the informant's negligence, not his intentional conduct. That close factual determi-

nations concerning employment status are necessary under 28 U.S.C. § 2671, *see supra* n. 7, does not provide persuasive grounds for extending the practice to decide mixed-claim cases under section 2680(h).

able from appellant's allegations in the present case. In both cases the gravamen of the complaint is that the Government failed to exercise adequate control over an individual committing intentionally tortious conduct while acting in some capacity on the Government's behalf.

Weinberg, even if not technically a federal "employee," was certainly acting on the Government's behalf as an undercover operative carrying out the Abscam investigation. The language of appellant's complaint itself furnishes a sufficient basis for barring his claim under *Panella, Johnson,* and *Miele:* "[T]he FBI employed or otherwise engaged Melvin Weinberg to assist in the [Abscam] investigation as an informant and operative, and Weinberg rendered his services, including all acts complained of herein, while under the control and supervision of the FBI and its special agents." Complaint ¶ 5; *see also id.* at ¶¶ 7, 8, 11, 17, 18.

*The "Independent Affirmative Duty" Exception.* Appellant's alternative argument is also without merit. Despite the broad reading given to section 2680(h)'s "arising out of" language, we have suggested that it may not bar mixed claims of negligence and intentional conduct in the relatively uncommon case in which the negligence alleged "was independent of the government's supervision of its employees," *Johnson v. United States, supra,* 788 F.2d at 853 n. 8 (discussing cases). The precise contours of this "independent affirmative duty" doctrine are slowly evolving in other circuits, *see Doe v. United States,* 838 F.2d 220, 222–24 (7th Cir.1988) (duty of Government child care center toward children in its care); *Thigpen v. United States, supra,* 800 F.2d at 398–402

(Murnaghan, J., concurring) (duty of Government hospital toward patients); *Gibson v. United States,* 457 F.2d 1391, 1394–96 (3d Cir.1972) (duty to prevent assaultive conduct of juvenile delinquent Job Corps trainee under Government care), and the doctrine has yet to be considered directly by this Court.[9]

■ The pending case, however, provides no occasion for elaboration of the doctrine. The mere fact that Guccione was the subject of an undercover investigation by the FBI gave rise to no special "affirmative duty" to protect Guccione independent of the Government's duty to supervise its agents. All citizens, of course, have the right to expect that the Government's agents will not cause deliberate harm to innocent persons. Breach of the high public trust necessarily placed in those carrying out covert law enforcement investigations justifiably causes concern, just as the magnitude of the indecencies alleged in *Johnson* was compounded due to the assailant's identity as an on-duty United States mail carrier. Yet to find an "independent affirmative duty" owed to each citizen in every case in which the Government carries out its basic functions would create an exception that would swallow the rule of section 2680(h). The present case is not one in which a plaintiff has been placed in the care or custody of the Government and thereafter suffers harm as a result of the negligent performance of a duty of protective care that the plaintiff was entitled to rely upon. *See Doe v. United States, supra* (children in Government child care center); *Doe v. Scott,* 652 F.Supp. 549 (S.D.N.Y.1987) (same); *Loritts v. United States,* 489 F.Supp. 1030 (D.Mass.1980) (member of singing group invited to visit West Point). There is no suggestion that Guccione relied upon the

---

**9.** *Panella v. United States, supra,* might be read as an affirmative duty case if attention is shifted from the Government's relationship to the *assailant* to its relationship to the *victim,* a patient at a federal prison hospital. *See also Brown v. United States,* 486 F.2d 284, 288 (8th Cir.1973) (FTCA claim permitted where federal prisoner attacked by fellow inmates); *Rogers v. United States,* 397 F.2d 12, 15 (4th Cir.1968) (FTCA claim permitted where prisoner alleged federal negligence led to attack by guardian); *cf. United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10

L.Ed.2d 805 (1963) (prisoner attacked by other inmates permitted to claim Government negligent in providing protection). Under this approach, the Government undertakes a duty of reasonable care to protect those in its penal custody from foreseeable harm, whatever its source. *See Prosser and Keeton on Torts, supra,* at 383 n. 9; *Restatement (Second) of Torts* § 314A, illustration 6 (1965); *see also* P. Schuck, *Suing Government* 33 (1983) (noting historical roots of liability of sheriffs and jailers).

Government's affirmative provision of care or services of any kind. *Cf. Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (Government liable for damages caused by negligently maintained lighthouse). Indeed, as far as Guccione knew, he was entering into arms-length business negotiations with a representative of Abdul, and he conducted himself accordingly. Whatever the ultimate contours of the affirmative duty doctrine, it is unavailable to Guccione under the circumstances of this case.

In view of our disposition, it is not necessary to reach the statute of limitations issue.

The judgment of the District Court is affirmed.